UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
                                        :
SHAWN MACHICOTE,                        :        06 Civ. 13320 (DAB)(JCF)
                                        :
            Petitioner,                 :           REPORT AND
                                        :           RECOMMENDATION
     - against -                        :
                                        :
ROBERT E. ERCOLE, Superintendent,       :
                                        :
            Respondent.                 :
- - - - - - - - - - - - - - - - - - -:
TO THE HONORABLE DEBORAH A. BATTS, U.S.D.J.:

     Shawn Machicote[1] brings this habeas corpus petition pursuant

to 28 U.S.C. § 2254, challenging his conviction in New York State

Supreme Court, New York County, for murder in the second degree.

In his petition, Mr. Machicote alleges that (1) his right to due

process was violated by the admission into evidence of statements

he made to detectives while incarcerated in North Carolina on

unrelated charges; (2)  his rights to a fair trial, due process,

and equal protection were violated when the trial court overruled

defense counsel's peremptory challenges against prospective jurors;

and (3) his right to confront witnesses was violated by the

introduction at trial of hearsay statements from a witness.  For

the reasons set forth below, I recommend that the petition be

denied.

---

        [1] In the trial transcript, briefs, and state court decisions
Mr. Machicote's first name is spelled "Sean."  However, he executed
the petition in this proceeding as "Shawn."

Background

A. The Crime

On July 24, 1993, at approximately 3:40 a.m., Renard George, an off-duty New York City Corrections Officer, was shot to death while driving along 125th Street in Manhattan with his friend and colleague, Terrence Evans. (H. at 24-27; Memorandum of Law In Support of Answer Opposing Petition for a Writ of Habeas Corpus ("Resp. Memo.") at 5).[2]

On that evening, Officer George and Officer Evans rented a car to travel to Washington D.C. together after their shifts ended. (Tr.(2) at 66).[3] They drove first to Harlem, made a few stops and arrived at 125th Street at about 3:00 a.m., where the street was crowded "like a block party." (Tr.(2) at 67-70).

About twenty minutes before the shooting, Officer George and Officer Evans parked their car on 125th Street. (Tr.(2) at 67-69, 108-09). Officer Evans got out and noticed two women near their car, one of whom was wearing a "mustard colored" dress. (Tr.(2) at 75-76). Officer Evans exchanged a few words with her and she jokingly asked him to "watch [her] back" because she was getting a

_____

[2] "H." refers to the minutes of the suppression hearing. Since the respondent has failed to locate a copy of the hearing transcript, I will cite to the petitioner's and respondent's briefs for references to the hearing.

[3] "Tr.(2)" refers to the second volume and most of the third volume of the state trial transcript. "Tr." will refer to the first volume, which contains the jury voir dire, and "Tr.(3)" will refer to the latter section of the third volume, which contains the post-trial proceedings. This reflects the pagination of the transcripts received from the state court.

lot of attention.  (Tr.(2) at 77).

A few minutes later, Officer Evans heard an argument going on behind him involving the woman in the mustard colored dress and a man later identified as the petitioner.  (Tr.(2) at 77-78).  This argument was the first time Officer Evans encountered Mr. Machicote.  (Tr.(2) 78).

The argument ended when Officer George intervened and stated "there is not going to be a problem."  (Tr.(2) at 79-80, 82, 119-20).  In his statement to detectives, the petitioner said that Officer George raised his shirt to reveal a gun.  (Tr.(2) at 305). Mr. Machicote then walked away.  (Tr.(2) at 82).

Later, Officer George and Officer Evans got back into their car, with Officer George in the driver's seat.  (Tr.(2) at 82-83). While they were stopped at a traffic light at 125th Street and Eighth Avenue, someone fired a number of bullets toward their vehicle, which jerked forward and collided with the car in front of it.  (Tr.(2) at 84, 151, 197, 203, 541).  The car then veered onto the sidewalk and collided with a pole.  (Tr.(2) at 85).  Officer Evans caught a glimpse out of the corner of his eye of a figure holding a gun, but did not see who the shooter was.  (Tr.(2) at 84, 132).  Officer Evans asked Officer George if he was all right and Officer George replied that he was "hit."  (Tr.(2) at 84).  Officer Evans then called 911, and a few minutes later an ambulance arrived on the scene to take Officer George to the hospital.  (Tr.(2) at 85-87, 261).  Officer George died at St. Luke's Hospital from a

gunshot wound to the chest.  (Tr.(2) at 221-23, 243-46).

Information from witnesses and anonymous phone calls to the police hotline and to the local police precinct directed the police investigation toward Mr. Machicote.  (Tr.(2) at 332).  One person identified the shooter as "Shawn," and another as "Shawn G. from St. Nicholas projects."  (H. at 27, 29, 97-99; Brief for Respondent ("Resp. App. Br."), attached as Exh. B to Declaration of Beth Fisch Cohen dated March 14, 2007 ("Cohen Decl."), at 3).  Informants also said that the shooter had appeared as a dancer in music videos by rap artists Wreckx 'n Effect and M.C. Lyte.  (H. at 28-29, 99; Resp. App. Br. at 3-4).  Based on that information, officers compiled a tape with music videos by these artists.  (H. at 27, 93; Resp. App. Br. at 4).  Two days after the shooting, on July 26, 1993, Officer Evans went to the 28th Precinct to look at four or five rap music videos.  (Tr.(2) at 88-89).  After a second viewing of M.C. Lyte's "Ruff Neck" music video, he recognized one of the dancers as Mr. Machicote, the man who exchanged words with Officer George.  (Tr.(2) at 95, 105).

On August 3, 1993, Detective Kevin Martin prepared three photograph arrays including Mr. Machicote's picture.  (H. 32, 52, 166-67; Resp. App. Br. at 4).  Officer Evans viewed one of these arrays, selected Mr. Machicote's photograph, and identified him as the man involved in the dispute with Officer George.  (H. 171-72, 190; Resp. App. Br. at 4-5).

B. <u>The Arrest</u>

1. <u>The North Carolina Interview</u>

Seven months later, in February 1994, the police learned that the petitioner was in custody in North Carolina on unrelated charges. (H. at 32-33, 149, 153; Resp. App. Br. at 5). On February 15, 1994, New York City Police Department Detectives Alan Hayes and Kevin Martin visited Mr. Machicote at Wake County Jail in Raleigh, North Carolina in connection with the homicide investigation. (H. at 33, 149-50, 174; Resp. App. Br. at 5).

Upon their arrival at the facility, the detectives checked their weapons and proceeded to an interview room. (H. at 33-34, 150-51, 155, 163; Resp. App. Br. at 5).[4] The room was a "plain 12

---

[4] There is apparently testimony that suggests that while Detective Hayes had checked his weapon upon entering the prison, Detective Martin continued to carry his gun while interviewing Mr. Machicote. (H. at 163; Pet. App. Memo. at 7, 19; Resp. Memo. at 27-28). Mr. Machicote did not raise this issue in his appeal, but now claims in his petition that the detectives who questioned him were "armed with weapons." (Addendum to Petition for Writ of Habeas Corpus ("Pet. Memo."), 2nd unnumbered page).

The respondent argues that the testimony indicating that Detective Martin retained his firearm during the interview is a "transcription error." They point to Detective Hayes' testimony at the suppression hearing that he and Detective Martin were required "to check [their] weapons" before entering the jail, and to his identical testimony at trial. (Tr. at 301; Resp. Memo. at 28). They also argue that it would be illogical for the correctional facility to compel one detective to check his weapon, but allow his partner to keep his weapon. (Resp. Memo at 27-28). I am somewhat handicapped in assessing the merits of these competing claims by my inability to read the testimony in question; nonetheless, the weight of evidence seems to suggest that Detective Martin was probably not armed when he entered the interview room. In any event, his possession of a gun of which the petitioner may or may not have been aware would not change the outcome here.

by 12 room painted white, where there were 4 or 6 chairs and a flat table."  (H. at 34, 155-56; Brief for Defendant-Appellant Sean Machicote ("Pet. App. Br."), attached as Exh. A to Cohen Decl., at 7).  Mr. Machicote was escorted into the room by a corrections officer who then left. (H. at 34-35, 156-57; Resp. App. Br. at 6). He was not handcuffed or otherwise restrained during the interview. (H. at 34, 156-57; Resp. App. Br. at 6).  He sat at the head of the table, while the detectives sat opposite each other.  (H. at 35; Resp. App. Br. at 6).

Detective Hayes introduced himself and Detective Martin and informed Mr. Machicote they were from the New York City Police Department (the "NYPD").  (Tr.(2) 303).  Defective Hayes explained that Mr. Machicote's name had come up in the investigation regarding "a shooting on 125th Street the prior July," and that they wanted to talk to him about it.  (H. at 35, 158; Resp. Memo. at 6).  Mr. Machicote inquired whether they knew his uncle, who worked for the NYPD.  (H. at 36; Resp. Memo. at 6, 44).  Detective Hayes then verified the spelling of Mr. Machicote's name, and took down his address and date of birth.  (H. at 36; Resp. Memo. at 6).

Thereafter, Detective Hayes asked Mr. Machicote to tell them "what happened that night."  (H. at 36; Resp. Memo. at 6).  It is undisputed that Mr. Machicote did not receive <u>Miranda</u> warnings prior to being asked this question.  (H. at 158-59, 174-75; Resp. Memo. at 6).  The petitioner gave an oral statement to the detectives, then agreed to write down what he had told them.  (H.

6

at 38, 160; Resp. Memo. at 6; Pet. App. Br. at 8).

In his oral and written statements, Mr. Machicote gave the following account.  He stated that he had been walking on 125th Street when he encountered a young black woman in a yellow dress sitting on a car.  (H. at 36-37, 45-46; Resp. Memo. at 6; Pet. App. Br. at 8).  According to Mr. Machicote, the woman made a "negative remark" to him, and he asked her, "What was all of that about?"  (H. at 36-37, 45-46; Resp. Memo. at 6; Pet. App. Br. at 8).  The woman then turned toward a man inside the car and asked whether he was "going to let [Mr. Machicote] get away with dis(s)ing [her]."  (H. at 36-37, 45-46; Resp. Memo. at 6; Pet. App. Br. at 8).  The man in the car said something to Mr. Machicote "in her defense," but Mr. Machicote explained that he "didn't want no problems."  (H. at 36-37, 45-46; Resp. Memo. at 6-7; Pet. App. Br. at 8).  Despite this, Mr. Machicote said, the man "was still fronting on [him] and reach[ed] for a gun."  (H. at 36-37, 45-46; Resp. Memo. at 7; Pet. App. Br. at 8).  Mr. Machicote became "scared and backed up from off of him"  (H. at 36-37, 45-46; Resp. Memo. at 7; Pet. App. Br. at 8).  He also lifted his shirt to show the man that he was "not armed so he could let [him] leave without shooting."  (H. at 36-37, 45-46; Resp. Memo. at 7; Pet. App. Br. at 8). After this encounter, Mr. Machicote stated that he and his friend left, went to go talk to some girls, then heard shots and saw the crowd running towards them.  (H. at 36-37, 45-46; Resp. Memo. at 7; Pet. App. Br. at 8).  They then went to the park and then to get something to eat, but

had no further encounters before going home. (H. at 36-37, 45-46; Resp. Memo. at 7; Pet. App. Br. at 8).

Once Mr. Machicote completed his statement and signed his name, Detective Hayes asked him to draw a diagram of the locations where the events transpired. (H. at 38-41; Resp. Memo. at 7; Pet. App. Br. at 8). After doing so, Mr. Machicote volunteered that he knew another woman who was on the street that night who could verify that he was not the shooter. (H. at 48; Resp. App. Br. at 8). Detective Hayes gave Mr. Machicote his business card and informed him that if he was able to locate the woman, she should call the Police Department directly. (H. at 48; Resp. App. Br. at 8). The detectives then summoned the corrections officer and they all left together. (H. at 48, 160; Resp. App. Br. at 8). The entire interview lasted approximately one hour. (H. at 48, 160; Resp. App. Br. at 8). The detectives did not have an arrest warrant for Mr. Machicote in the New York case at the time of this interview and did not inform Mr. Machicote that he would be arrested for the homicide. (H. at 50, 154, 162-63; Resp. App. Br. at 8).

2. <u>The Witnesses</u>

Two witnesses, Byron Rhodes and Stephanie Arthur witnessed the shooting, but they did not inform the authorities of what they saw until several months later. (Tr.(2) at 430-31, 470-71, 542-43). On February 9, 1994, Detective Hayes interviewed Ms. Arthur at her home and learned she was an eyewitness to the July 1993 shooting.

(Tr.(2) at 430-31). At the time of the crime, she was sitting inside her boyfriend's parked car, which was parked at 125th Street and 8th Avenue. (Tr.(2) at 422-24, 458, 461). She testified that she ducked when she first heard shots, but only stayed down for a "mere second" and then looked up from behind her car door. (Tr.(2) at 425, 461, 463-64). Through the clearing smoke, she saw a black man with a bald head and medium build standing in the street, holding a gun and shooting as he walked toward Mr. George's car. (Tr.(2) at 425-27, 464). Ms. Arthur did not recognize the shooter at that time, but later realized that it was Mr. Machicote. (Tr.(2) at 382, 431). Ms. Arthur testified that shortly after the shooting she had overheard people in the crowd say that the shooter was "Shawn in the rap video" and that she then "put two and two together" and figured out the identity of the man she had seen. (Tr.(2) at 431, 438-39). Ms. Arthur was familiar with Mr. Machicote as she had been introduced to him at a hair salon owned by Mr. Machicote's mother. (Tr.(2) at 421-22, 440, 443-44). Though she had seen him several times, they had never engaged in conversation other than to say "hello." (Tr.(2) at 421-22, 443-44). She had also seen Mr. Machicote in the "Ruff Neck" rap video. (Tr.(2) at 421-22).

On February 9, 1994, Ms. Arthur was shown one of the other photograph arrays Detective Martin had prepared the previous August. (H. at 28-30, 101, 103-4, 172; Resp. App. Br. at 5). She selected Mr. Machicote's photograph and identified him as "Shawn."

(H. at 30; Resp. App. Br. at 5).

The second witness, Byron Rhodes, was arrested in March 1994 on assault charges that were later dropped. (Tr.(2) at 543). While in custody, Mr. Rhodes told police officers that he had witnessed a shooting the previous July. (Tr.(2) at 543-44). After Mr. Rhodes' release, Detective Hayes followed up with him regarding the shooting. (Tr.(2) at 359, 544).

At trial, Mr. Rhodes testified that he was selling t-shirts on 125th Street that evening when he encountered Mr. Machicote, who asked him for a t-shirt. (Tr.(2) at 530-32). Later that evening, he again saw Mr. Machicote while he was pushing a shopping cart with his merchandise along 125th Street. (Tr.(2) at 616-18). At that time, Mr. Rhodes overheard a conversation between Lamont, an acquaintance of his, and the petitioner. (Tr.(2) at 618). He heard Mr. Machicote say, "I'm going to do him, I'm going to do him" and then saw Mr. Machicote lift his shirt and show Lamont "something black" and say "I got mine." (Tr.(2) at 535-36, 618-21). He further testified that Mr. Machicote saw Officer George's convertible, followed it down the street, and, when it stopped at the light, pulled out a gun and fired at the car. (Tr.(2) at 541). Mr. Rhodes ducked and heard eight or nine more shots fired. (Tr.(2) at 541).

On July 14, 1994, five months after the interview, Detective Hayes took Officer Evans and Mr. Rhodes to view a lineup in Raleigh, North Carolina. (Tr.(2) at 100-01, 313-14). Both

witnesses identified Mr. Machicote as the man they had seen the night of Officer George's death. (Tr.(2) at 100-102, 130-31, 547).[5]

On November 17, 1994, Mr. Machicote was charged with second degree murder.

C. Court Proceedings

Prior to trial, the petitioner moved to suppress the statements he made to the NYPD detectives while incarcerated in North Carolina and the lineup proceeding at which Officer Evans and Mr. Rhodes identified him. Justice John A. K. Bradley denied the petitioner's suppression motions. He found that the lineup proceeding had been conducted properly and that it was unnecessary to administer Miranda warnings prior to the North Carolina interview because there was no "added imposition of constraint beyond the mere fact of it taking place in a prison." (H. at 338-40; Resp. App. Br. at 11).

During jury selection, defense counsel raised a Batson objection over the prosecution's use of its peremptory strikes against female African American prospective jurors. (Tr. at 376). Justice Bradley rejected the objection. (Tr. at 384). Later, the prosecution raised a reverse-Batson objection because defense counsel's use of peremptory challenges effectively struck all eight prospective jurors who were white males. (Tr. at 386, 390-91).

_____

[5] A third witness, Oscar Reyes, was also taken to view the lineup that day, but he selected a filler. (Tr.(2) at 324, 346-47).

11

After hearing defense counsel's rationale for striking the jurors, the court re-seated two white males, Joseph Lombardo and Peter Lewis, that the petitioner had challenged. (Tr. 391-401). Counsel indicated that his reason for challenging Mr. Lombardo was that this juror had noted that his stepsister was "involved with drugs"; counsel argued that even though there were no drug allegations in the trial, Mr. Machicote's appearance in a rap video and the "strong relationship between drugs and rap" might influence Mr. Lombardo's thinking. (Tr. at 394). As for Mr. Lewis, defense counsel suggested that he appeared "not really focused on what was going on." (Tr. at 395). The judge found these explanations insufficient and re-seated both jurors. Defense counsel objected to this remedy and suggested that two black women whom the prosecution had stricken from the jury should also be seated for "fairness." (Tr. at 401-02). Justice Bradley granted this application. (Tr. at 401-02).

The trial commenced on May 1, 1996. During trial, defense counsel objected to the testimony of Stephanie Arthur on the grounds that she was "not testifying from her recollection," but instead from what she had heard from others.[6] (Tr.(2) at 431-32). The court refused to strike the testimony, but instructed the jury that what Ms. Arthur heard from others was admissible only insofar

---

[6] Ms. Arthur testified that she "didn't see him [Mr. Machicote] shoot the guy, but after a while, after I heard that it was the guy Shawn in the rap video, I put two and two together." (Tr.(2) at 431).

as it informed her mental state. (Tr.(2) at 437). At that point, Mr. Machicote's counsel moved for a mistrial; Justice Bradley denied the motion. (Tr.(2) at 437).

At the conclusion of trial, the jury convicted Mr. Machicote of second degree murder. (Tr.(2) at 940). Prior to sentencing, defense counsel moved to set aside the verdict pursuant to New York Criminal Procedure Law ("CPL") § 330.30. (Tr.(3) at 2-3). Counsel argued that the refusal to reveal Ms. Arthur's identity until she testified prevented him from accessing information concerning her credibility. (Tr.(3) at 3-6). After trial, defense counsel obtained affidavits from two witnesses that contradicted the testimony of Ms. Arthur concerning the number of occasions on which she had contact with Mr. Machicote. (Tr.(3) at 7-8). He argued that in light of this new evidence, the verdict should be set aside or at minimum a hearing should be held to evaluate Ms. Arthur's credibility. (Tr.(3) at 11). Justice Bradley denied the petitioner's motion without a hearing and sentenced him to a term of twenty-five years to life. (Tr.(3) at 33).

D. The Appeal

Mr. Machicote appealed, asserting five claims. He contended that (1) the motion to suppress his statements to the NYPD detectives should have been granted; (2) the prosecution's Batson application should not have been granted; (3) Ms. Arthur's hearsay testimony was wrongfully admitted; (4) the jury's verdict was against the weight of the evidence; and (5) his motion to set aside

the verdict was wrongly denied. (Pet. App. Memo. at 18-62). In this petition he advances the first three of these claims.

The Appellate Division rejected each of Mr. Machicote's arguments. The court found that his conversation with the NYPD detectives while he was incarcerated in North Carolina was "amicable," and that there was no reason to believe that restrictions, beyond ordinary confinement in a correctional facility, existed. People v. Machicote, 23 A.D.3d 264, 265, 804 N.Y.S.2d 77, 77 (1st Dep't 2005). The Appellate Division also concluded that the trial court properly granted the prosecution's reverse-Batson application. Id. at 265, 804 N.Y.S.2d at 77. Finally, the court concluded that the petitioner's claim that Ms. Arthur's testimony constituted hearsay and was impermissibly admitted had no merit. It reasoned that her testimony was admitted for the legitimate, non-hearsay purpose of explaining her state of mind and the mental process that allowed her to identify the defendant. Id. at 265, 804 N.Y.S.2d at 77. The court further concluded that the trial judge provided proper limiting instructions, and "if admission of this testimony could be deemed erroneous, any such error was harmless. To the extent that defendant is raising a constitutional claim, such claim is unreserved and we decline to review it in the interest of justice. Were we to review the constitutional claim, we would reject it." Id. at 265, 804 N.Y.S.2d at 78.

Leave to appeal to the New York Court of Appeals was denied on

January 26, 2006.  <u>People v. Machicote</u>, 6 N.Y.3d 777, 811 N.Y.S.2d 345 (2006).

<u>Discussion</u>

A. <u>Standard of Review</u>

Prior to passage of the Antiterrorism and Effective Death Penalty Act (the "AEDPA"), 28 U.S.C. § 2254 <u>et.</u> <u>seq.</u>, federal courts were not required to defer to state court determinations of law or of mixed questions of law and fact when considering habeas petitions.  <u>See</u> <u>Thompson v. Keohane</u>, 516 U.S. 99, 107-12 (1995); <u>Brown v. Artuz</u>, 283 F.3d 492, 497 (2d Cir. 2002).  Under the AEDPA, however, a federal court may grant a writ of habeas corpus to a state prisoner only where the state court adjudicated the claim on the merits and where that adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts."  <u>Williams v. Taylor</u>, 529 U.S. 362, 413 (2000)(O'Connor, J., concurring).  Under the "unreasonable application" prong, "a federal habeas court may grant the writ if

the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id.  Congress chose the term "unreasonable," not "erroneous" or "incorrect" to modify "application."  28 U.S.C. 2254(d)(1); see Williams, 529 U.S. at 411.  Thus, it follows that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Williams, 529 U.S. at 411. However, the petitioner need not show that all reasonable jurists would agree that a State court determination is incorrect in order for it to be unreasonable.  Id. at 409-12.  Instead, a Federal court should review a State court's interpretation of Federal law using a standard of objective reasonableness.  Id. at 409.  The "increment of incorrectness beyond error . . . need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence."  Yung v. Walker, 341 F.3d 104, 109-10 (2d Cir. 2003) (quoting Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks omitted)).

This deferential standard applies only to claims adjudicated on the merits by the state court.  If the state court did not adjudicate the claim on the merits, federal courts review the claim de novo.  The Second Circuit has held that the phrase "adjudicated

on the merits" has "a well-settled meaning: a decision finally resolving the parties' claims . . . that is based on the substance of the claim advanced, rather than on a procedural, or other, ground." Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001). A state court need not articulate the reasoning that underlies its rejection of a claim in order for its adjudication to be "on the merits." Id. Here, there is no dispute that the state appellate court reviewed the petitioner's claims and disposed of them on the merits; thus, the standard of review set out by the AEDPA applies.

       B. Miranda Claims

Mr. Machicote contends that the statements he made during his February 1994 interview, while incarcerated in a North Carolina correctional facility, were the product of custodial interrogation and that therefore Miranda warnings were mandated. He argues that since Miranda warnings were not administered, his right to due process was violated when the trial court allowed these statements into evidence.

The rationale for the warnings mandated by Miranda v. Arizona is that in-custody interrogation places "inherently compelling pressures" on an individual; therefore, the interview must be preceded by advice to the subject regarding his legal rights, including the right to remain silent and the right to counsel. 384 U.S. 436, 444, 467 (1966). Conversely, Miranda warnings are not required unless the person being questioned is deemed to be "in custody." See Stansbury v. California, 511 U.S. 318, 322 (1994);

Oregon v. Mathiason, 429 U.S. 492, 495 (1977). "[T]he mere fact of imprisonment does not mean that all of a prisoner's conversations are official interrogations that must be preceded by Miranda warnings." United States v. Willoughby, 860 F.2d 15, 23 (2d Cir. 1988); cf. United States v. Kadem, 317 F. Supp. 2d 239, 241 (W.D.N.Y. 2004) (although fact of incarceration is not dispositive with respect to inquiry into whether person being interviewed was "in custody," "that inquiry must include consideration of the fact of incarceration")(quoting United States v. Chamberlain, 163 F.3d 499, 502 (8th Cir. 1998)). Instead, the issue is "whether a given curtailment of freedom of action exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights." Id. (quoting Berkemer v. McCarty, 468 U.S. 420, 437 (1984)). In the Second Circuit, the standard for determining whether custody exists in cases in which the individual being interrogated is incarcerated was further explicated in United States v. Morales, 834 F.2d 35 (2d Cir. 1987). See United States v. Newton, 369 F.3d 659, 670-71 (2d Cir. 2004); Georgison v. Donelli, No. 04 Civ. 1444, 2005 WL 1384015, at *5 (S.D.N.Y. June 9, 2005). Morales holds that custody exists when: (1) the questioning was conducted in a "custodial setting" with "inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak," and (2) the questioning was conducted by officers "who are aware of the potentially incriminatory nature

18

of the disclosures sought." 834 F.2d at 38; accord United States v. Rodriguez, 356 F.3d 254, 259 (2d Cir. 2004). "Only questioning that reflects a measure of compulsion above and beyond that inherent in custody itself constitutes interrogation the fruits of which may be received in evidence only after Miranda warnings have been given." Id.; see also Willoughby, 860 F.2d at 23.

The petitioner argues that because the questioning took place in a correctional facility, Miranda warnings were necessary at the time of his interview. However, whether the petitioner's questioning warranted Miranda warnings depends not on his presence in a correctional facility, but on the specific circumstances of his interview. Here, there is little evidence that there were restrictions on his freedom beyond those placed on any prisoner, and with which he had already been living for some time. See Willoughby, 860 F.2d at 23 (even though defendant was a prisoner there was no "compulsion above and beyond [] confinement" that required him to speak). Although a corrections officer escorted Mr. Machicote from his prison cell, the officer did not observe the interview, nor did he stand guard outside the room.[7] The interview took place in an interview room, not a prison cell. The petitioner was not handcuffed or shackled during the interview and there is no reason to think that he was not free to leave the interview, if not

---

[7] While the ultimate question of whether Mr. Machicote was in custody is a legal one and must be reviewed independently by the federal courts, the factual findings of the state court must be "presumed to be correct." 28 U.S.C. § 2254(e)(1); Thompson v. Keohane, 516 U.S. 99, 102 (1995).

the jail, at any time.[8]  See Georgison, 2005 WL 1384015, at *5 (finding no custody because "petitioner was questioned in the visitor's room of the prison and was not restrained in any way"); United States v. Freeman, No. 04-M-4078, 2005 WL 3032514, at *3-4 (W.D.N.Y. Nov. 10, 2005)(no custody where suspect was not handcuffed, was questioned in an unlocked room, and was not forced to answer questions); see also Tankleff v. Senkowski, 135 F.3d 235, 243-44 (2d Cir. 1998)(discussing importance of whether defendant was free to leave interview).  However, in United States v. McFarland, 424 F. Supp. 2d 427, 444 (N.D.N.Y. 2006), the court found that an interview conducted under similar circumstances -- the prisoner was alone in a prison interview room with three people he knew to be police officers and was not advised of his Miranda rights or that he could refuse to answer -- constituted custodial interrogation.[9]

The exchange between the detectives and Mr. Machicote during the interview likewise appears to reflect minimal coercion.  When the petitioner entered the interview room, the detectives introduced themselves and explained that they were there because his name had come up in the investigation of Officer George's murder.  The petitioner shook hands with the detectives, verified

---

[8] As noted earlier, while Mr. Machicote has suggested that Detective Martin carried a gun during their interview (Pet. App. Memo. at 19; Pet. Memo., 2nd unnumbered page), the weight of evidence seems to suggest otherwise.

[9] In both that case and this one, the presence of the second Morales factor -- the "investigative intent" of the officers -- is unquestioned.  See McFarland, 424 F. Supp. 2d at 444-45.

the spelling of his name and his address, and then asked if they knew his uncle, who worked for the New York Police Department. Such behavior "hardly suggests the mindset of a person intimidated by his custodial surroundings." United States v. Rizvi, No. 91 Cr. 377, 1992 WL 80771, at *2 (S.D.N.Y. April 2, 1992). The petitioner then agreed to talk about the events in question, produced a written statement, and drew a diagram that reflected his recollection of the night of the crime. There is no evidence that the petitioner was forced to answer any questions, see Georgison, 2005 WL 1384015, at *5, though there is likewise no evidence that he was ever apprised of his right to refuse to answer questions. In addition, Mr. Machicote volunteered unsolicited information during the course of the interview, including telling the detectives there was another woman present that night who might have information. At the end of the interview, Mr. Machicote took the detective's card and agreed to contact him if he was able to locate the woman he mentioned.

Taken as a whole, the circumstances of the interview provide relatively little indication of coercion beyond the mere fact of imprisonment. At a minimum, there is insufficient evidence to find that the state court's decision in admitting the information obtained during the interview at trial was contrary to, or involved a unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d). Consequently, the petitioner's claim must be denied.

C. <u>Batson and Peremptory Challenges</u>

The petitioner claims that he was deprived of his constitutional rights when two white male jurors were seated over his peremptory challenges. He argues that "[t]he court gave no reason for its refusal to accept the peremptory challenge of counsel, nor did it even state that it considered the explanation given by counsel, it simply ordered that it would seat the juror as juror number ten." (Pet. Memo., 3rd unnumbered page). Mr. Machicote appears to raise two concerns here: first, that his due process rights, as established by <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986), were violated when the trial judge proceeded through the three steps of a reverse-<u>Batson</u> inquiry without verbalizing his ruling on each of the steps; and second, that he wrongfully lost his right to peremptory challenges when two jurors were seated over defense counsel's objection.

1. <u>Failure to Articulate Holding</u>

<u>Batson</u> held that exercising peremptory strikes on the basis of a juror's race is unconstitutional. 476 U.S. at 89.[10] In <u>Batson</u>, the Court prescribed a three-step test to be employed by trial courts to determine whether a party has exercised peremptory challenges in a discriminatory manner. <u>See</u> <u>Batson</u>, 476 U.S. at 96-

---

[10] Although Batson itself involved peremptory challenges by the prosecution, the rule applies equally to the exercise of peremptory challenges by defendants. <u>Georgia v. McCollum</u>, 505 U.S. 42, 59 (1992). A motion by the prosecution regarding a defendant's use of peremptory challenges is sometimes referred to as a "reverse-<u>Batson</u> motion." <u>See, e.g.</u>, <u>Overton v. Newton</u>, 295 F.3d 270, 273, (2d Cir. 2002).

98; <u>Messiah v. Duncan</u>, 435 F.3d 186, 194 (2d Cir. 2006).  In step one, the opponent of a peremptory challenge must make out a prima facie case that the other party has used its peremptory challenges in a racially discriminatory manner.  <u>Purkett v. Elem</u>, 514 U.S. 765, 767 (1995); <u>Batson</u>, 476 U.S. at 96-97; <u>Messiah</u>, 435 F.3d at 194.  At this stage, the moving party has only a minimal burden and does not have to prove discrimination by a preponderance of the evidence.  <u>See</u> <u>Johnson v. California</u>, 545 U.S. 162, 170-73 (2005); <u>Overton</u>, 295 F.3d at 279 n.10.   "An oft-used method for such a showing is the description or discernment of a 'pattern' of strikes against panelists who are members of particular protected groups." <u>Messiah</u>, 435 F.3d at 194.  In step two, "the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation."  <u>Purkett</u>, 514 U.S. at 767; <u>Batson</u>, 476 U.S. at 93-96; <u>Messiah</u>, 435 F.3d at 195.  Finally, in step three, if the striking party tenders a race-neutral explanation, "the trial court must then decide whether the opponent of the strike has proved purposeful racial discrimination."  <u>Id.</u>

The petitioner's contention that the trial judge failed to adequately articulate the steps of the <u>Batson</u> process was rejected on the merits by the Appellate Division, which found that though the trial judge did not articulate specific rulings as he moved through the steps of <u>Batson</u>, "[t]he issue of whether the People established a prima facie case of discrimination became moot when the court ruled on the second and third <u>Batson</u> steps."  <u>People v.</u>

Machicote, 23 A.D.3d at 265, 804 N.Y.S.2d at 77. There is insufficient evidence on this record to overturn that holding.

First, the trial judge in this case had previously demonstrated that he understood this three-step process when he ruled on defense counsel's Batson challenge; in particular, he had noted that defense counsel was required to first establish a prima facie case of discriminatory challenges by the prosecution. (Tr. at 376-84). When the prosecutor raised his reverse-Batson challenge, the trial judge, rather than ruling explicitly on whether a prima facie case of discrimination had been established, merely prompted defense counsel to respond; defense counsel then immediately proceeded to the second step of Batson, offering race-neutral reasons for his challenges. (Tr. at 391). The Supreme Court addressed almost this precise situation in Hernandez v. New York, 500 U.S. 352 (1991). In that case, "[a]fter petitioner raised his Batson objection, the prosecutor did not wait for a ruling on whether petitioner had established a prima facie case of racial discrimination. Instead, the prosecutor volunteered his reasons for striking the jurors in question." Id. at 356. The court found that this omission did not affect the validity of the Batson challenge. Instead, it held that "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." Id. at

24

359; see also Williams v. Burge, No. 04 Civ. 2590, 2005 WL 2429445, at *6 (S.D.N.Y. Oct. 3, 2005)("when a trial judge proceeds immediately to the second step of Batson's three-part framework, the question of whether a prima facie case actually existed is moot"). Though the instant case is marginally distinguishable from Hernandez in that in Hernandez counsel defended his use of peremptory challenges "without any prompting or inquiry from the trial court," Hernandez, 500 U.S. at 359, whereas here the court did prompt defense counsel to respond, that difference does not change the analysis. See Ware v. Filion, No. 04 Civ. 6784, 2007 WL 1771583, at *3 (S.D.N.Y. June 19, 2007)("Where the prosecutor proffered an explanation for the peremptory challenge and the trial court ruled . . . on the prosecutor's racial motivation, the reviewing court does not rule on the sufficiency of the petitioner's prima facie showing."); Rose v. Senkowski, No. 99 CV 6053, 2003 WL 21698240, at *12 (E.D.N.Y. July 8, 2003)(holding that "any inadequacy in the prima facie showing became moot" where "trial judge, without ruling on the record as to the sufficiency of defense counsel's prima facie showing, requested an explanation for the prosecution's challenges and the prosecutor offered explanations for his challenge . . . without objection"); DeBerry v. Portuondo, 277 F. Supp. 2d 150, 158-59 (E.D.N.Y. 2003)(upholding ruling where "trial judge's general procedure was to proceed to step two of the Batson process by asking for race-neutral reasons immediately after a question was raised about the propriety of the

strike").

Certainly defense counsel had the opportunity to question whether a prima facie case had been established, as the prosecutor had done when defense counsel raised his <u>Batson</u> objection. (Tr. at 377-78); <u>see</u> <u>United States v. Moore</u>, 4 F. Supp. 2d 319, 320 (S.D.N.Y. 1998) (whether prosecutor had made prima facie showing was moot where "[w]ithout requesting a ruling on whether the prosecution had established a prima facie case of discrimination, defense counsel responded to the Government's challenge"). Instead, all parties seemed to assume that a prima facie showing of discrimination had been made with respect to the prosecution's reverse-<u>Batson</u> challenge and thus proceeded to the second step of the analysis.[11]  In allowing them to do so, the trial judge did not violate petitioner's rights.

### 2. <u>Overruling of Petitioner's Peremptory Challenges</u>

The petitioner's second claim is essentially a request to remedy what he believes to be the wrongful loss of two peremptory

---

[11] Nor was it unreasonable for them to have done so.  Both sides agree that defense counsel challenged eight out of eight white male jurors; such a challenge rate of 100%, even of such a narrowly-defined group, is sufficient to present a prima facie case of reverse-<u>Batson</u> discrimination.  <u>See</u> <u>Dotson v. Ercole</u>, No. 06 Civ. 7823, 2007 WL 1982730, at *6 (S.D.N.Y. July 10, 2007)(defendant's "use of five of six challenges to strike non-black jurors, four of whom were white women" sufficient to raise prima facie inference of discrimination); <u>Walters v. Mitchell</u>, No. 99 Civ. 2579, 2002 WL 1751400, at *3 (S.D.N.Y. July 18, 2002)(holding that defendant's strikes of five non-black jurors and one black juror established a prima facie case of discrimination); <u>Moore</u>, 4 F. Supp. 2d at 320-21 (defendant's strikes of eight out of eight white males established prima facie discriminatory pattern of strikes).

challenges, which occurred when the trial judge granted the prosecution's reverse-<u>Batson</u> motion. The petitioner alleges that this denial violated his Sixth Amendment right to a jury trial and his due process rights. (Pet. Memo., 2nd-3rd unnumbered pages). However, this Court cannot provide a remedy for this claim because it does not raise a federal constitutional issue.

Federal habeas corpus review extends only to alleged "violation[s] of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Thus, habeas relief is not available where a violation of New York state law did not constitute a federal constitutional violation. <u>Ayala v. Leonardo</u>, 20 F.3d 83, 92 (2d Cir. 1994); <u>see also</u> <u>Lewis v. Jeffers</u>, 497 U.S. 764, 780 (1990) ("federal habeas corpus relief does not lie for errors of state law"). The right to peremptory challenge is established through New York state law and does not have an equivalent in the United States Constitution or federal law. <u>See</u> <u>United States v. Martinez-Salazar</u>, 528 U.S. 304, 311-14 (2000); <u>Georgia v. McCollum</u>, 505 U.S. 42 (1992)("peremptory challenges are not constitutionally protected fundamental rights; rather, they are but one state created means to the constitutional end of an impartial jury and a fair trial."); <u>Ross v. Oklahoma</u>, 487 U.S. 81, 88 (1988) ("peremptory challenges are not of federal constitutional dimension"). Therefore, "[a]lthough the Second Circuit has not yet ruled on the issue, district courts within the Circuit have uniformly held that a state court ruling sustaining a

reverse-<u>Batson</u> challenge may not be reviewed on habeas corpus because there is no constitutional right to peremptory challenges." <u>Ramirez v. Phillips</u>, No. 04 Civ. 1516, 2007 WL 2362138, at *3 (E.D.N.Y. Aug. 14, 2007); <u>see, e.g.</u>, <u>Torres v. Smith</u>, No. 03 Civ. 906, 2005 WL 158068, at *9-10 (S.D.N.Y. July 6, 2005); <u>Ramirez v. Poole</u>, No. 03 Civ. 5202, 2005 WL 1123775, *3-5 (E.D.N.Y. May 9, 2005); <u>Haywood v. Portuando</u>, 288 F. Supp. 2d 446, 463 (S.D.N.Y. 2003); <u>Black v. Herbert</u>, No. 00 Civ. 8825, 2002 WL 1880711 (S.D.N.Y. Aug. 14, 2002); <u>Green v. Kelly</u>, No. 99 Civ. 9082, 2000 WL 1871711, at *6 (S.D.N.Y. Dec. 21, 2000); <u>but see</u> <u>Dotson</u>, 2007 WL 1982730, at *6 (addressing habeas corpus petitioner's claim challenging reverse-<u>Batson</u> ruling on the merits); <u>Walters</u>, 2002 WL 1751400, at *3 (same); <u>Moore</u>, 4 F. Supp. 2d at 320-21 (same). Therefore, the overruling of Mr. Machicote's peremptory challenges by itself does not implicate a federally-guaranteed right and, as such, is not cognizable on habeas review. Accordingly, his claim must be denied.

    C. <u>The Admission of Stephanie Arthur's Testimony</u>

    Finally, the petitioner claims that Stephanie Arthur's testimony regarding out of court statements that helped her to identify him constituted hearsay and violated his Sixth Amendment right to confront the witnesses the against him.

        1. <u>Hearsay Claim</u>

    Mr. Machicote contends that the trial court wrongfully admitted Ms. Arthur's testimony, which he claims included hearsay.

28

Specifically, he complains that Ms. Arthur was permitted to testify that she had heard from others that the man who shot Mr. George was "the guy Shawn in the rap video." (Tr.(2) at 431). Defense counsel objected that this testimony was hearsay as it was not from Ms. Arthur's own "recollection," but the trial judge admitted it for the purpose of demonstrating Ms. Arthur's mental processes in identifying the defendant and issued a limiting instruction to that effect. (Tr.(2) at 437). On appeal, the Appellate Division found that the testimony had been properly admitted "for the legitimate, non-hearsay purpose of explaining that witness's state of mind." Machicote, 23 A.D.3d at 265; 804 N.Y.S.2d at 78. Moreover, the court found that any error in the admission of the testimony was harmless. Id. at 265; 804 N.Y.S.2d at 78.

As discussed above with regard to peremptory challenges, federal habeas review "is limited to deciding whether a conviction violated the Constitution, laws, or treatises of the United States." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). Thus, an evidentiary ruling such as admission of hearsay "may provide a basis for habeas corpus relief only if a petitioner establishes that it 'so infused the trial with unfairness as to deny due process of law.'" Smith v. Conway, No. 06 Civ. 7674, 2007 U.S. Dist. LEXIS 89579, at *19 (S.D.N.Y. Dec. 6, 2007)(quoting Estelle, 502 U.S. at 75); see also Rosario v. Kuhlman, 839 F.2d 918, 925 (2d Cir. 1988) ("[E]rroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant

issuance of a writ of habeas corpus.  Rather, the writ would issue

only where [the] petitioner can show that the error deprived [him]

of a fundamentally fair trial.")(quoting Taylor v. Curry, 708 F.2d

886, 891 (2d Cir. 1983)(emphasis in original)).  In other words,

> [A] petitioner seeking to prove that a constitutional
> violation occurred through the state court's erroneous
> admission of evidence must establish that "the
> erroneously admitted evidence, viewed objectively in
> light of the entire record before the jury, was
> sufficiently material to provide the basis for conviction
> or to remove a reasonable doubt that would have existed
> on the record without it." The erroneously admitted or
> withheld evidence "must have been crucial, critical,
> highly significant."

Robinson v. Greene, 507 F. Supp. 2d 279, 294 (W.D.N.Y.

2007)(quoting Collins v. Scully, 755 F.2d 16, 19 (2d Cir. 1985)).

Thus "[t]he petitioner bears a heavy burden in seeking to establish

that improperly admitted evidence deprived him of his right to a

fair trial."  Neloms v. Brown, 05 Civ. 8162, 2007 WL 809703, at *7

(S.D.N.Y. Mar. 19, 2007); see also Bonet v. McGinnis, 98 Civ. 6529,

2001 WL 849454, at *2 (S.D.N.Y. July 27, 2001)(petitioners face a

"heavy burden, for generally, rulings by state trial courts on

evidentiary issues, even if erroneous, do not rise to the level of

a constitutional violation.").

Construing his complaint liberally, Mr. Machicote appears to

allege that the admission of Ms. Arthur's testimony was an error of

constitutional magnitude.  He argues that Ms. Arthur's testimony

"was the only one [] which the prosecution could rely upon" since

the only other eyewitness to the shooting, Mr. Rhodes, was an

admitted crack addict.  (Pet. Memo., 1st unnumbered page).

To sustain such a claim, Mr. Machicote must first establish that the admission of the challenged evidence violated a state evidentiary rule. See Roman v. Filion, No. 04 Civ. 8022, 2005 WL 1383167, at *26 (S.D.N.Y. Jun. 10, 2005); Williams v. Walker, No. 00-CV-5912, 2001 WL 1352105, at *3 (E.D.N.Y. Oct. 31, 2001); Simmons v. Ross, 965 F. Supp. 473, 480 (S.D.N.Y. 1997). It does not appear that there was any evidentiary error. "The general rule in New York is that an out-of-court statement is admissible if it is not admitted for the truth of the matter stated, but for another purpose." Curry v. Burge, 03 Civ. 0901, 2004 WL 2601681, at *26-27 (S.D.N.Y. Nov. 17, 2004); see also People v. Ealey, 272 A.D.2d 269, 270, 710 N.Y.S.2d 321, 322-23 (1st Dep't 2000). Here, the trial court admitted Ms. Arthur's statement "only for her mental state and not for the truth." See United States v. Bellomo, 176 F.3d 580, 587 (2d Cir. 1999)(testimony that "went to [witness's] state of mind not to the truth of any fact" was not hearsay); Bergstein v. Board of Education, 34 N.Y.2d 318, 324 (1974)("where a witness' state of mind is relevant, the witness may testify to out-of-court statements made by others which would indicate circumstantially what the witness believed at that time"); Ealey, 272 A.D.2d at 270, 710 N.Y.S.2d at 322-23 (testimony establishing victim's state of mind "was not hearsay because it was not received for its truth"); Grossjahann v. Geo. B. Wilkins & Sons, 244 A.D.2d 808, 810, 666 N.Y.S.2d 271, 272 (3d Dep't 1997)("evidence of that out-of-court statement, submitted not to establish the truth of the statement

31

but to indicate circumstantially what plaintiff believed at the time, is not hearsay"). In this case, Ms. Arthur's state of mind was particularly material as it explained how she made the identification of Mr. Machicote. Moreover, as the Appellate Division noted, the judge issued a limiting instruction regarding the disputed testimony. Though it may be the case that, as the petitioner argued in his appeals brief, such an instruction "could not dissipate [the] prejudicial impact" of the testimony (Pet. App. Memo. at 46), it is well-established that "[t]he jury is presumed to obey a court's curative instruction." Rosario v. Walsh, 05 Civ. 2684, 2006 WL 1431410, at *21-22 (S.D.N.Y. May 25, 2006); see also Richardson v. Marsh, 481 U.S. 200, 211 (1987) ("juries are presumed to follow their instructions").

The petitioner argued on appeal that "the mere identification of a relevant non-hearsay use of such evidence is insufficient to justify its admission if the jury is likely to consider the statement for the truth of what was stated with significant resultant prejudice." See United States v. Reyes, 18 F.3d 65, 70 (2d Cir. 1994). However, in this case, the jury's consideration of this evidence was not "so extremely unfair that its admission violates fundamental conceptions of justice." Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998). Ms. Arthur was going to identify Mr. Machicote as the shooter in any event; given this, it does not seem "extremely unfair" to allow the jury to hear how she arrived at that identification. If anything, her description of the mental

process leading to her identification of Mr. Machicote, in which she described her inability to identify him initially and only later "put[ting] two and two together," exposed her testimony to greater attack. And indeed, defense counsel did challenge her testimony on that basis on a number of occasions during trial. (Tr.(2) at 466, 469, 816-18). Certainly, the Appellate Division's decision on this point was not "contrary to" or "an unreasonable application of" Supreme Court law. 28 U.S.C. § 2254. Accordingly, Mr. Machicote's claim that Ms. Arthur's testimony constituted hearsay and was impermissibly admitted is without merit.

### 1. Confrontation Clause Claim

The admission of hearsay testimony is generally a violation of the Sixth Amendment's Confrontation Clause, which provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The clause "reflects a preference for face-to-face confrontation at trial, and . . . 'a primary interest secured by [the provision] is the right of cross-examination.'" Ohio v. Roberts, 448 U.S. 56, 63 (1980) (footnote omitted) (quoting Douglas v. Alabama, 380 U.S. 415, 418 (1965)). Mr. Machicote contends that the admission of Stephanie Arthur's testimony regarding out of court statements identifying him as the shooter violated his Sixth Amendment rights. The respondent argues that this claim is procedurally defaulted because the petitioner did not clearly raise an objection on constitutional grounds during trial.

A procedural default generally bars a federal court from reviewing the merits of a habeas claim. <u>Wainwright v. Sykes</u>, 433 U.S. 72 (1977). Federal habeas review is prohibited if a state court rests its judgment on a state law ground that is "independent of the federal question and adequate to support the judgment." <u>Cotto v. Hebert</u>, 331 F.3d 217, 238 (2d Cir. 2003) (quoting <u>Coleman v. Thompson</u>, 501 U.S. 722, 729 (1991)). A state procedural bar qualifies as an "independent and adequate" state law ground where "'the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar.'" <u>Levine v. Commissioner of Correctional Services</u>, 44 F.3d 121, 126 (2d Cir. 1995) (quoting <u>Harris v. Reed</u>, 489 U.S. 255, 262 (1989)). Here, the Appellate Division found Mr. Machicote's Confrontation Clause claim unpreserved, presumably because his objection to Ms. Arthur's testimony failed to reference any explicitly constitutional grounds for the objection. <u>People v. Machicote</u>, 23 A.D.3d at 265, 804 N.Y.S.2d at 78 ("To the extent that defendant is raising a constitutional claim, such claim is unpreserved and we decline to review it in the interest of justice.").[12]

---

[12] Though the Appellate Division briefly discussed the merits of the petitioner's constitutional claim in an alternative holding, this does not render the petitioner's claim reviewable in a habeas corpus proceeding. "[F]ederal habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits of the federal claim." <u>Glenn</u>, 98 F.3d at 724 (quoting <u>Velasquez v. Leonardo</u>, 898 F.2d 7, 9 (2d Cir. 1990)); see also Harris v. Reed, 489 U.S. 255, 264 n.10 (1989) ("[A] state court need not fear reaching the merits

Under New York's contemporaneous objection rule, an issue is properly preserved for appeal only if the appellant objected on that ground during the trial below. <u>Glenn v. Bartlett</u>, 98 F.3d 721, 724 n.2 (2d Cir. 1996) (citing <u>People v. Cona</u>, 49 N.Y.2d 26, 33-34, 424 N.Y.S.2d 146, 148-49 (1979)); <u>see also</u> N.Y. Criminal Procedure Law § 470.05(2). Moreover, "New York's highest courts uniformly instruct that to preserve a particular issue for appeal, defendant must specifically focus on the alleged error." <u>Garvey v. Duncan</u>, 485 F.3d 709, 714-15 (2d Cir. 2007)(citing <u>People v. Gray</u>, 86 N.Y.2d 10, 19, 629 N.Y.S.2d 173, 175 (1995)). The purpose of the contemporaneous objection rule is to facilitate the proper application of the law at trial. Thus, "a defendant [must] specify the grounds of alleged error in sufficient detail so that the trial court may have a fair opportunity to rectify the error." <u>Id.</u> at 715 (citing <u>People v. McLane</u>, 256 A.D.2d 10, 10-11, 682 N.Y.S.2d 24, 25 (1st Dep't 1998)). "If a state appellate court refuses to review the merits of a criminal defendant's claim of constitutional error because of his failure to comply with . . .a 'contemporaneous objection' rule, a federal court generally may not consider the merits of the constitutional claim on habeas corpus review." <u>Peterson v. Scully</u>, 896 F.2d 661, 663 (2d Cir. 1990); <u>see also</u> <u>Garcia v. Lewis</u>, 188 F.3d 71, 78-79 (2d Cir. 1999); <u>Wainwright v. Sykes</u>, 433 U.S. 72, 82-86 (1977).

In this case, while the petitioner's trial counsel objected to

of a federal claim in an <u>alternative</u> holding.").

Ms. Arthur's testimony at trial, he made no mention of the right to confront the witness, nor indeed of any constitutional grounds for his objection.  Counsel's primary objection was to the basis for Ms. Arthur's identification of Mr. Machicote: he argued that she was not able to independently identify him as the shooter and that her entire testimony should be stricken on that basis.  (Tr. at 431-36).  Therefore, it cannot be said that the Appellate Division's holding that any constitutional claim was not preserved for review was contrary to, or an unreasonable application of, clearly established federal law.

A federal habeas court may not review a prisoner's claim if that claim was procedurally defaulted in state court "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law."  Coleman v. Thompson, 501 U.S. 722, 750 (1991).  Cause for procedural default requires a showing that some external impediment actually prevented counsel from raising the claim.  McCleskey v. Zant, 499 U.S. 467, 497 (1991); Murray v. Carrier, 477 U.S. 478, 492 (1986).  A petitioner suffers actual prejudice if the outcome of the case would likely have been different had the alleged constitutional violation not occurred.  See Reed v. Ross, 468 U.S. 1, 12 (1984); Trottie v. Mantello, No. 98 Civ. 5581, 1999 WL 187202, at *4 (S.D.N.Y. April 6, 1999).

Alternatively, even if the petitioner is unable to meet the cause and prejudice standard, his claim may be heard if he can show

that failure to consider the claim would result in a fundamental miscarriage of justice. Coleman, 501 U.S. at 750. However, only in an "extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent," will "a federal habeas court [] grant the writ even in the absence of a showing of cause for the procedural default." Murray, 477 U.S. at 496; accord Spence v. Superintendent, Great Meadow Correctional Facility, 219 F.3d 162, 170 (2d Cir. 2000).

In this case, Mr. Machicote has made no effort to demonstrate that either of these exceptions apply. In any event, he cannot meet the cause and prejudice standard because he has proffered no compelling explanation for the failure to object to the charge during trial.[13] Nor is this an "extraordinary case" that has clearly "resulted in the conviction of one who is actually innocent." Murray, 477 U.S. at 496. Consequently, this Court cannot review the claim.

Even if the petitioner's hearsay objection were sufficient to raise his Confrontation Clause claim, that claim would fail on the merits. It is well-established that "[t]he [Confrontation] Clause does not bar the use of testimonial statements for purposes other

_____

[13] The heading of this section in Mr. Machicote's petition states that his "right to confront witness[es] against himself were violated" and that "counsel was thereby made ineffective since he could not properly prepare a defense." (Pet. Memo., 1st unnumbered page). However, an ineffective assistance of counsel claim cannot constitute cause for procedural default unless that claim was itself exhausted in state court. See Edwards v. Carpenter, 529 U.S. 446, 451-53 (2000); DiSimone v. Phillips, 461 F.3d 181, 191 (2d Cir. 2006). Here, Mr. Machicote never raised an ineffetive assistance claim in the state courts.

than establishing the truth of the matter asserted." <u>Crawford</u>, 541 U.S. at 59 n.9 (citing <u>Tennessee v. Street</u>, 471 U.S. 409, 414 (1985)).  Thus, "[i]t has long been the rule that '[s]o long as . . . statements are not presented for the truth of the matter asserted, but only to establish a context . . . the defendant's Sixth Amendment rights are not transgressed.'" <u>United States v. Paulino</u>, 445 F.3d 211, 216 (2d Cir. 2006) (quoting <u>United States v. Barone</u>, 913 F.2d 46, 49 (2d Cir. 1990)); <u>see also</u> <u>Rolland v. Greiner</u>, No. 02 Civ. 8403, 2006 WL 779501, at *3 (S.D.N.Y. March 27, 2006) (no Confrontation Clause violation when court admitted testimony of police detectives about a non-testifying co-defendant's statements inculpating petitioner for the purpose of explaining what led detectives to interview defendant five years after crime).  Since, as discussed above, Ms. Arthur's statements were admitted only to show her state of mind and to establish a context for her identification of the petitioner, there was no violation of the petitioner's Sixth Amendment rights.

<u>Conclusion</u>

For the reasons set forth above, I recommend that Mr. Machicote's petition for a writ of habeas corpus be denied. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation.  Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the

Honorable Deborah A. Batts, Room 2510, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

James C. Francis IV

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:    New York, New York
          January 18, 2008

Copies mailed this date to:

Shawn Machicote
03-A-4774
Green Haven Correctional Facility
Stormville, New York 12582

Morrie I. Kleinbart, Esq.
Beth Fisch Cohen, Esq.
Assistant District Attorneys
One Hogan Place
New York, New York 10013